IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 29, 2023 Session

**STATE OF TENNESSEE v. SETH POWELL**

**Appeal from the Criminal Court for Knox County
No. 117707   G. Scott Green, Judge**

_____

**No. E2022-00347-CCA-R3-CD**

_____

A Knox County Criminal Court jury convicted the defendant, Seth Powell, of possession with intent to sell, deliver, or manufacture 15 grams or more of heroin within 1,000 feet of a park; possession with intent to sell, deliver, or manufacture fentanyl within 1,000 feet of a park; possession with intent to sell, deliver, or manufacture .5 grams or more of cocaine within 1,000 feet of a park; three counts of possession of a firearm with the intent to go armed during the commission of a dangerous felony; three counts of possession of a firearm with the intent to go armed during the commission of a dangerous felony after having been previously convicted of a dangerous felony; and evading arrest. The trial court merged various convictions and imposed an effective 16-year sentence. On appeal, the defendant contends that the evidence is insufficient to support his convictions, that the trial court erred in failing to exclude inadmissible hearsay evidence, that his separate convictions for possession of heroin and fentanyl should be merged because they were contained in the same mixture, and that his firearm convictions should be merged into one conviction. Upon review, we affirm the judgments of the trial court but remand to the trial court for entry of judgments in Counts 8, 10, 14, and 16 through 21, showing that the charges for those counts were dismissed by the State.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JILL BARTEE AYERS, J., joined.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Seth Powell.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta'Kisha Fitzgerald and Oscar Butler, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

On April 15, 2020, officers with the Knox County Sheriff's Office ("KCSO") executed a search warrant at a house in Knox County, Tennessee. Based on evidence seized during the search, the Knox County Grand jury returned a 21-count indictment on July 15, 2020, charging the defendant with the following offenses:

Count 1: Possession with intent to sell, deliver, or manufacture "more than 15 grams" of heroin, a Schedule I controlled substance, within 1,000 feet of real property that comprises a preschool, child care agency, library, recreational center, or park.

Count 2: Possession with intent to sell, deliver, or manufacture less than 200 grams of fentanyl, a Schedule II controlled substance, within 1,000 feet of real property that comprises a preschool, child care agency, library, recreational center, or park.

Count 3: Possession with intent to sell, deliver, or manufacture "more than" .5 grams of a substance containing cocaine, a Schedule II controlled substance, within 1,000 feet of real property that comprises a preschool, child care agency, library, recreational center, or park.

Count 4: Possession with intent to sell, deliver, or manufacture less than .5 grams of a substance containing methamphetamine, a Schedule II controlled substance, within 1,000 feet of real property that comprises a preschool, child care agency, library, recreational center, or park.

Count 5: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver heroin.

Count 6: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver fentanyl.

Count 7: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver cocaine.

Count 8: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver methamphetamine.

Count 9: Possession of a firearm after having been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving the use of a deadly weapon.

Count 10: Possession of a firearm after having been convicted of a felony drug offense.

Count 11: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver heroin, after having been previously convicted of a dangerous felony.

Count 12: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver fentanyl, after having been previously convicted of a dangerous felony.

Count 13: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver cocaine, after having been previously convicted of a dangerous felony.

Count 14: Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, manufacture, or deliver methamphetamine, after having been previously convicted of a dangerous felony.

Count 15: Evading arrest.

Count 16: Knowingly maintaining a building that is used for the unlawful keeping of controlled substances.

Counts 17-21: Gang enhancements.

Prior to trial, the State dismissed Counts 4, 8, 14, 16, and 17 through 21. The trial court severed Counts 9 and 10, and the State later dismissed those counts. The defendant's trial for the remaining counts began on October 11, 2021.

Detective Logan Sammons with KCSO's property crimes division testified that he obtained a search warrant for the house as part of his investigation into a stolen AR-15 rifle. Because the officers were searching for firearms, the SWAT team accompanied the officers to the home. Detective Sammons stated that when he arrived at the home, he observed the defendant "leave on foot, trying to evade us." Although the officers identified themselves as police officers, the defendant continued to run. The officers were able to apprehend the defendant, and when they picked the defendant off the ground, cash in the amount of $1,600 fell off his person.

Detective Sammons testified that he entered the home through the front door leading into the living room where he observed an AR-15 rifle to the left of a couch and beside the rifle's bag. He also observed a .45-caliber handgun on the armrest of the couch within an arm's reach of the AR-15 rifle. He stated that a set of scales and a "blunt weed rolled up ready to smoke" were on a coffee table. He looked underneath the couch and

found several small baggies containing what he believed to be narcotics. He said that the narcotics were on the same side of the couch where the handgun and AR-15 rifle had been found and were within "inches of the rifle." Officers located more narcotics, baggies, and "things of that nature" in a black bag that was on the back of a second couch located "directly across from where the handgun" was located.

Detective Sammons testified that he never saw Kayla Hatmaker inside the house and that he believed members of the SWAT team took her into custody as he and other officers were detaining the defendant. Photographs depicting both the defendant and Ms. Hatmaker were hanging on the walls inside the house. Officers found drugs inside Ms. Hatmaker's purse which was also in the living room.

During cross-examination, Detective Sammons testified that there was no evidence that the defendant had stolen the AR-15 rifle; rather, Detective Sammons understood that the rifle had been sold to the defendant. When asked whether he agreed that the house belonged to Ms. Hatmaker and that the defendant was "staying there," Detective Sammons replied, "At this point in time, we knew through past history that they both stayed at this house. As far as who owned it or anything like that, that's unclear, but we knew this was where they were at." Detective Sammons acknowledged that he did not have a deed or lease for the house with the defendant's name on it. When asked whether he had any personal knowledge that the defendant lived at the house, Detective Sammons replied, "I did have a confidential informant come to me and tell me where he was at, along with a City of Knoxville Police Department report, that he was involved in at that same address."

Officer Traci Tassey with KCSO's forensic unit testified that she and another forensic officer, Officer Kendra Henderson, participated in the execution of the search warrant and documented the evidence found through video recordings and photographs. Officer Tassey stated that upon entering the living room, she observed a set of scales next to a coffee table and a "long gun," later identified as an AR-15 rifle, "at the coffee table" and next to a couch. Officers subsequently learned that the rifle had been reported as stolen and returned the rifle to its owner. Officer Tassey noted that 31 rounds of .233 ammunition were in the rifle's magazine, and officers located near the rifle a gun bag, a box containing another stock for the rifle, and "[a]ccessories," including a scope for the rifle. Officers located a "full box" of .223 rounds and an "almost full box" of .223 rounds of ammunition underneath the couch.

Officer Tassey noted that "possible narcotics" also were located in the living room. Officers found a .45 caliber handgun with a magazine loaded with 15 .45 caliber rounds on the armrest of a couch. The "hard-sided" case for the .45 caliber handgun, along with baggies and a bag containing narcotics were located in a bedroom. Two magazines

and 29 rounds of .45 caliber ammunition were in the "hard-sided" case, and five rounds of .45 caliber ammunition were in a green bag that was on the bed. Officer Tassey testified that pieces of mail addressed to the defendant at a different address were located in a bedroom.

During cross-examination, Officer Tassey testified that the AR-15 rifle had originally been against the coffee table and that by the time she entered the house, it had been moved to an area beside the couch. She noted that Ms. Hatmaker's purse was found on the same couch under which drugs had been located. She stated that a small baggie of possible narcotics and cash were found inside the purse.

Detective Khristian Pickett with KCSO's narcotics unit was accepted by the trial court as an expert in the field of narcotics investigation and identification. He testified that prior to the execution of the search warrant, he and other detectives maintained surveillance of the house and observed the defendant standing outside. Once SWAT officers arrived, the defendant ran, and Detective Pickett went behind the home in the event that the defendant ran to that area. Once Detective Pickett returned to the front of the home, he saw that other officers had taken the defendant into custody. Officer Pickett stated that during a search incident to an arrest, officers located cash on the defendant's person.

Detective Pickett testified that while executing the search warrant, officers located heroin, crack cocaine, and marijuana inside the home and methamphetamine inside Ms. Hatmaker's purse, and they submitted the drugs to the Tennessee Bureau of Investigation ("TBI") for testing. Detective Pickett determined that the heroin was possessed for resale because the heroin was divided into multiple baggies containing one-half to one gram each of heroin. He also determined that the crack cocaine, which totaled 17 grams, was for resale because it was "cut up" and packed in multiple baggies that were "tied off." Detective Pickett stated that the $1,600 in cash found on the defendant's person was divided into $100 bills folded individually in such a way as to appear "almost like it was a hundred dollars for every purchase for every time sold." Detective Pickett noted that a set of scales generally used during the course of narcotics distribution was on a coffee table, and he did not recall observing any "use paraphernalia," such as syringes, "burnt spoons," or "snort straws."

TBI Special Agent Mollie Stanfill, a forensic scientist with the TBI's forensic chemistry unit, was accepted by the trial court as an expert in the field of forensic chemistry, and she tested the substances submitted by the officers. She testified that a crystalline substance, which weighed .07 grams, was positive for methamphetamine, a Schedule II drug. She stated that a pink powder was a mixture of heroin, a Schedule I drug, and fentanyl, a Schedule II drug, and that the weight of the mixture was 34.38 grams. She also tested 2.8 grams of a "rock-like substance" that she identified as "cocaine base." She

stated that she did not test the additional 14.29 grams of the "rock-like substance," explaining that the 2.8 grams of crack cocaine exceeded the minimum amount necessary for the offense with which the defendant was charged and that the total amount of the "rock-like substance" submitted did not exceed the 26 grams of cocaine base necessary to elevate the offense.

Donna Roach with the Knoxville/Knox County KUB Geographic Information System provided a map showing that in April 2020, a park was located 1,000 feet from the "actual property line" of the home that was searched. Nathan Nease, the athletics coordinator for the City of Knoxville's parks and recreation department, testified regarding the various recreation and leisure activities offered at the park.

The State presented recordings of two telephone calls made from the defendant's account while incarcerated following his arrest. During one call, the caller stated that he was outside when the police arrived at the house and that he "took off running." He said that the officers entered the house and that "they catch me with two firearms, some H, some hard, and some weed." KCSO Detective John Sharp with the narcotics unit testified that, generally, "H" is a reference to heroin and that "hard" is a reference to crack cocaine.

During the second telephone call, the caller discussed a woman who had "set [him] up." He stated that the woman "sold me an AR-15 and then sent the police to come and get it." He said that the woman sent a text message at 8:00 a.m. on the day of the search stating that she had left her belongings in his car. The caller stated that when he went outside to look in his car, the police arrived and that "[t]hey got me away from the gun."

The State rested. After a *Momon* colloquy, the defendant elected not to testify, and he did not present any proof.

The jury convicted the defendant of possession with intent to sell, deliver, or manufacture more than 15 grams of heroin within 1,000 feet of a park; possession with intent to sell, deliver, or manufacture fentanyl within 1,000 feet of a park; possession with intent to sell, deliver, or manufacture "over" .5 grams of a substance containing cocaine within 1,000 feet of a park; three counts of possession of a firearm with the intent to go armed during the commission of a dangerous felony in Counts 5 through 7; three counts of possession of a firearm with the intent to go armed during the commission of a dangerous felony in Counts 11 through 13; and evading arrest.

During a bifurcated hearing regarding the enhanced provisions in Counts 11 through 13, the State presented evidence that in December 2004, the defendant was

convicted of possession of .5 grams or more of cocaine with the intent to sell for which he received an eight-year sentence and possession of marijuana with the intent to sell for which he received a one-year sentence. In 2013, the defendant was convicted of possession of more than one-half ounce of marijuana with the intent to sell for which he received a three-year sentence. Based on these prior convictions, the jury convicted the defendant of three counts of possession of a firearm with the intent to go armed during the commission of a dangerous felony after having been previously convicted of a dangerous felony in Counts 11 through 13.

A sentencing hearing was held on January 19, 2022. Although the jury's finding that the defendant possessed more than 15 grams of heroin increased the maximum fine to which the defendant was subject from $100,000 to $200,000, *see* T.C.A. § 39-17-417(b), (i)(1), the trial court imposed a $2,000 fine, as agreed upon by the parties. The trial court also imposed sentences for each conviction and merged multiple convictions as follows:

| Count 1 | Possession with intent to sell, deliver, or manufacture heroin within 1,000 feet of a park | 11 years as a standard offender to serve a minimum sentence of 8 years |
|---|---|---|
| Count 2 | Possession with intent to sell, deliver, or manufacture fentanyl within 1,000 feet of a park | 10 years as a multiple offender with a minimum service of 6 years; concurrent with Count 1 |
| Count 3 | Possession with intent to sell, deliver, or manufacture more than .5 grams of cocaine within 1,000 feet of a park | 11 years as a standard offender with a minimum service of 8 years; concurrent with Count 1 |
| Count 5 | Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, distribute, or manufacture heroin | 3 years as a multiple offender at 100%; consecutive to Count 1; and merged with Count 11 |
| Count 6 | Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, distribute, or manufacture fentanyl | 3 years as a multiple offender at 100%; concurrent with Count 5; consecutive to Count 2; and merged with Count 12 |
| Count 7 | Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, distribute, or manufacture cocaine | 3 years as a multiple offender at 100%; concurrent with Count 5; consecutive to Count 3; and merged with Count 13 |

| Count 11 | Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, distribute, or manufacture heroin, after having been previously convicted of a dangerous felony | 5 years as a multiple offender at 100%; consecutive to Count 1 |
|---|---|---|
| Count 12 | Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, distribute, or manufacture fentanyl, after having been previously convicted of a dangerous felony | 5 years as a multiple offender at 100%; concurrent with Count 11; and consecutive to Count 2 |
| Count 13 | Possession of a firearm with the intent to go armed during the commission of a dangerous felony, i.e., possession with intent to sell, distribute, or manufacture cocaine, after having been previously convicted of a dangerous felony | 5 years as a multiple offender at 100%; concurrent with Count 11; and consecutive to Count 3 |
| Count 15 | Evading arrest | 11 months, 29 days; concurrent with Count 1 |

Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. On August 24, 2022, the defendant filed a motion in this court to remand the case to the trial court for a hearing in accordance with Tennessee Code Annotated section 39-17-432(h) (2022) due to the recent amendments to the Drug-Free Zone provisions. This court granted the defendant's motion and remanded the case to the trial court. On December 13, 2022, the trial court granted the defendant's motion for resentencing. On January 5, 2023, the trial court entered amended judgments for the defendant's drug convictions, removing the requirement that the defendant serve a specified minimum term in confinement. The amended judgments reflected that the defendant is to serve his sentences for the heroin and cocaine convictions as a standard offender at 30 percent and his sentence for the fentanyl conviction as a multiple offender at 35 percent.

On appeal, the defendant asserts that the evidence is insufficient to support his convictions, that the trial court erroneously admitted inadmissible hearsay, and that the trial court erred in failing to merge multiple convictions.

*I. Sufficiency*

The defendant challenges the sufficiency of the evidence supporting his convictions, arguing that the evidence failed to establish that he was in possession of the drugs or the firearms and that even if possession was established, there was no proof that he possessed the firearms with the intent to go armed during the commission of a dangerous felony. The State responds that the evidence is sufficient to support the defendant's convictions. We agree with the State.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(c); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4). Heroin is a Schedule I controlled substance, *id*. § 39-17-406(c)(11), and cocaine and fentanyl are Schedule II controlled substances, *id*. § 39-17-408(b)(4), (c)(9). Possession with intent to manufacture, deliver, or sell a Schedule I controlled substance is a Class B felony. *Id.* § 39-17-417(b). Possession with intent to manufacture, deliver, or sell a Schedule II controlled substance is a Class C felony. *Id.* § 39-17-417(c)(2)(A) (Supp. 2019). With regard to cocaine, the offense is a Class B felony "if the amount involved is point five (0.5) grams or more of any substance containing cocaine." *Id.* § 39-17-417(c)(1) (Supp. 2019).[1] The term "possession" embraces both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). For a person to "constructively possess" a drug, that person must have "the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others." *Id.* (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the

---

[1] Although not applicable to the present case, Code section 39-17-417(c) was amended effective July 1, 2023, to provide that a conviction for the manufacture, delivery, or sale of fentanyl or the possession of fentanyl with the intent to manufacture, deliver, or sell is a Class B felony "if the amount involved is point five (0.5) grams or more of any substance containing . . . fentanyl." *See* T.C.A. § 39-17-417(c)(1) (Supp. 2023).

controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419.

"[I]t is an offense to possess a firearm . . . with the intent to go armed during the commission of or attempt to commit a dangerous felony." *Id*. § 39-17-1324(a). "A felony involving . . . possession with intent to sell, manufacture or distribute a controlled substance" constitutes a "[d]angerous felony." *Id.* § 39-17-1324(i)(1)(L). "A violation of subsection (a) is a Class D felony, punishable by a mandatory minimum five-year sentence to the department of correction, if the defendant, at the time of the offense, had a prior felony conviction." *Id.* § 39-17-1324(g)(2). As with drugs, possession of a firearm "may be actual or constructive." *Key v. State*, 563 S.W.2d 184, 188 (Tenn. 1978). "Constructive . . . possession may occur only where the personally unarmed participant has the power and ability to exercise control over the firearm." *Id.*

In our view, the evidence adduced at trial sufficiently supports the defendant's possession of the controlled substances and firearms. Officers obtained a search warrant for the house during the course of an investigation of a stolen AR-15 rifle, and the officers observed the defendant in the driveway prior to his arrest. We recognize that the mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). However, the evidence taken in the light most favorable to the State established more than the mere presence of the defendant at the house. Detective Sammons testified that he knew "through past history" that both the defendant and Ms. Hatmaker "stayed" at the house. Photographs of the defendant were on the walls inside the house, and officers located mail addressed to the defendant, albeit at a different address, in a bedroom. Officers found various drugs individually packaged for sale in the living room, and a set of scales on the coffee table. Near the drugs were a loaded AR-15 rifle and a loaded .45 caliber handgun, and the defendant acknowledged during a telephone call from jail that the rifle belonged to him and that he had purchased the rifle sometime prior to the search. During the telephone call, the defendant stated that prior to the search, he exited the house after he received a text message from the seller stating that she left her belongings in his car. The defendant suggested that the text message was a ruse to "g[e]t me away from the gun" and stated that the police arrived after he exited the house. Although the defendant asserts that no evidence was presented at trial positively identifying his voice in the recordings of the calls, we conclude that based on the evidence, including the fact that the calls were made from his personal account at the jail and the details of the offenses discussed during the calls, a jury could reasonably determine that the calls were placed by the defendant.

Furthermore, the defendant ran from the police, and after officers apprehended him, they discovered $1,600 in cash on his person. Detective Pickett testified

that the cash was divided into $100 bills and that each of the bills was individually folded in such a way as to appear "almost like it was a hundred dollars for every purchase for every time sold." We conclude that this evidence is sufficient to establish the defendant's constructive possession of the drugs and the firearms in that he had the power and intention to exercise dominion and control over them.

The defendant asserts that the proof established that Ms. Hatmaker was in possession of the drugs and the firearms. He notes that Ms. Hatmaker was inside the house when the officers arrived and that her purse, which was on one of the couches in the living room, contained a small amount of methamphetamine. The jury rejected the defendant's argument at trial that Ms. Hatmaker was solely responsible for the drugs and the firearms, and the evidence, when viewed in the light most favorable to the State, is sufficient to establish that the defendant was also in possession of the drugs and the firearms.

The defendant argues that even if the evidence was sufficient to establish that he "possessed the controlled substances with the intent to sell, deliver, or manufacture them and that he possessed one or both of the firearms, there was no evidence that he possessed the firearms with the intent to go armed during the commission of the underlying controlled substance crimes." The loaded firearms were located in close proximity to the individually-packaged drugs and the set of scales. The defendant acknowledged during a telephone call from the jail that he had purchased the AR-15 rifle, and he claimed that prior to the search, a text message was sent to him as a ruse to get him out of the house and away from the rifle until the police arrived. This evidence is sufficient to establish that the defendant possessed the firearms with the intent to go armed during the commission of the underlying controlled substance offenses. The defendant is not entitled to relief on this issue.

## II. Admission of Hearsay

The defendant contends that the trial court erred in overruling his objection to inadmissible hearsay evidence presented during his cross-examination of Detective Sammons at trial. The following exchange occurred during the defendant's cross-examination of Detective Sammons at trial:

Q Well, let me ask you if you can remember. From this, would you agree that that was Kayla Hatmaker's house, but you understand that [the defendant] was staying there?

A At this point in time, we knew through past history that they both stayed at this house. As far as who owned it or anything like that, that's unclear, but we knew this was where they were at.

- 11 -

Detective Sammons acknowledged that the defendant's name was not on a deed or lease for the house. The questioning during cross-examination continued as follows:

> Q . . . So, Detective Sammons, if you could tell me—you'd mentioned something about, you know, having information that that was, you know, where he was staying, both of them were staying there?
>
> A Yes, sir.
>
> Q Your information, wasn't just based on seeing—I don't know if it was you necessarily, seeing his car there over a couple of weeks before then, seeing his car coming and going there?
>
> A That was not me, sir. So I can't testify to that. I have no idea. That was—(inaudible).
>
> Q Okay. Well, then, I guess, let me ask you this. Do you have any personal knowledge yourself saying that he lives in that house?
>
> A I did have a confidential informant come to me and tell me where he was at, along with a City of Knoxville Police Department report, that he was involved in at that same address.

Defense counsel asked to approach the bench, and during a bench conference, defense counsel objected and maintained that he did not "open[ ] the door" to the testimony. The trial court overruled the defendant's objection, stating, "You asked the question."

On appeal, the defendant asserts that Detective Sammons' testimony that he was aware that the defendant lived at the house searched based on information that he received from a confidential informant and a KPD report of a prior incident at the home was inadmissible hearsay. *See* Tenn. R. Evid. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). The defendant maintains that the trial court erred in overruling his objection to the testimony. The State does not challenge the defendant's claim that the testimony was hearsay. Rather, the State asserts that the defendant invited the claimed error through the questions that he posed to Detective Sammons during cross-examination and that any error in the admission of the evidence is harmless.

Upon reviewing the series of questions posed by the defendant and Detective Sammons' responses, we conclude that the defendant elicited the challenged testimony through the question posed to Detective Sammons and that Detective Sammons' testimony was in direct response to the question posed. "[I]t is well-settled that a litigant 'will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequences of his own neglect or misconduct.'" *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004) (quoting *Norris v. Richards*, 246 S.W.2d 81, 85 (Tenn. 1952)); *see* Tenn. R. App. P. 36(a).

Regardless, we conclude that any error in the admission of the evidence was harmless. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see State v. Reynolds*, 635 S.W.3d 893, 928 (Tenn. 2021) (providing that when a trial court "admits evidence in violation of the Tennessee Rules of Evidence, we ordinarily address this non-constitutional error using the harmless error analysis of Rule 36(b)"). The defendant does not challenge the admission of Detective Sammons' testimony that he knew "through past history" that both the defendant and Ms. Hatmaker "stayed" at the house. During closing arguments, the State did not rely upon the challenged testimony in arguing the defendant's connection to the house and the drugs and firearms found inside the house; rather, it was the defendant who addressed the challenged testimony. In light of the other evidence presented at trial establishing the defendant's constructive possession of the drugs and firearms, including his own statements, we cannot conclude that any error in the admission of the evidence "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b).

### III. Merger of Offenses

The defendant asserts that his three separate convictions for possession of a firearm with the intent to go armed during the commission of a dangerous felony after having been previously convicted of a dangerous felony violated double jeopardy principles. He maintains that the convictions involved "a single act of possession, not multiple acts" and that his possession of more than one type of controlled substance "did not somehow convert his single act of possessing the firearms into multiple acts of possessing them." The defendant also asserts that his dual convictions of possession of heroin with the intent to sell, deliver, or manufacture and possession of fentanyl with the intent to sell, deliver, or manufacture rose to the level of plain error when the two controlled substances were contained within the same mixture. The State responds that the defendant is not entitled to relief.

- 13 -

"It is well settled in Tennessee that, under certain circumstances, two convictions or dual guilty verdicts must merge into a single conviction to avoid double jeopardy implications." *State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015). "Whether multiple convictions violate double jeopardy is a mixed question of law and fact that we review de novo with no presumption of correctness." *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

Both the federal and state constitutions protect an accused from being "twice put in jeopardy of life or limb" for "the same offence." U.S. Const. amend. V; Tenn. Const. art. 1, sec. 10. The state and federal provisions, which are quite similar in verbiage, have been given identical interpretations. *See State v. Waterhouse*, 8 Tenn. (1 Mart. & Yer.) 278, 284 (1827) ("[W]e did not feel ourselves warranted in giving [the double jeopardy provision of the state constitution] a construction different from that given to the constitution of the United States, by the tribunal possessing the power, (and of pre-eminent qualifications) to fix the construction of that instrument."). The United States Supreme Court has observed of the double jeopardy clause:

> Our cases have recognized that the Clause embodies two vitally important interests. The first is the "deeply ingrained" principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." The second interest is the preservation of "the finality of judgments."

*Yeager v. United States*, 557 U.S. 110, 117-18 (2009) (citations omitted). To these ends, our state supreme court has observed that the Double Jeopardy Clause provides "three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

At issue here is the third category, "protection against multiple punishments for the same offense." *Id*. "[I]n single prosecution cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors and courts from exceeding the punishment legislatively authorized." *Id*. at 542. Claims of this type "ordinarily fall into one of two categories, frequently referred to as 'unit-of-prosecution' and 'multiple description' claims." *Id*. at 543.

- 14 -

"When addressing unit-of-prosecution claims, courts must determine 'what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment.'" *Id.* at 543 (citations omitted). To determine the appropriate unit of prosecution, "we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified." *State v. Smith*, 436 S.W.3d at 768 (citations omitted). "If the unit of prosecution is clear from the statute, there is no need to review the history of the statute and other legislative history." *State v. Hogg*, 448 S.W.3d 877, 886 (Tenn. 2014). If the unit of prosecution is not clear from the plain language of the statute, "we review the history of the statute. Finally, we perform a factual analysis as to the unit of prosecution." *Smith*, 436 S.W.3d at 768 (citation omitted). A reviewing court must "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution." *Watkins*, 362 S.W.3d at 543 (citations omitted).

The defendant was convicted in Counts 5 through 7 of possession of a firearm with the intent to go armed during the commission of a dangerous felony with the underlying dangerous felonies listed as the heroin, fentanyl, and cocaine felony offenses of which he also was convicted. The defendant was convicted in Counts 11 through 13 of possession of a firearm with the intent to go armed during the commission of a dangerous felony after having been previously convicted of a dangerous felony. The trial court merged Count 5 into Count 11, Count 6 into Count 12, and Count 7 into Count 13. The defendant argued that the firearms offenses should be merged into a single conviction because each conviction related to the same firearms. The State responded that three separate firearm convictions were warranted because the defendant committed three separate dangerous felonies and possessed a firearm during the commission of those dangerous felonies. The trial court declined to merge the firearm convictions into a single firearm conviction.

Our supreme court has determined the unit of prosecution applicable to Code section 39-17-1324(b) "to be each act of employing a firearm during the commission of or attempt to commit a dangerous felony." *State v. Harbison*, 539 S.W.3d 149, 168-69 (Tenn. 2018) ("Nothing in the language of the statute indicates that the legislature intended to limit the unit of prosecution to the number of firearms employed by a defendant."). Stated differently, "the General Assembly has authorized a separate employing a firearm charge for each dangerous felony committed." *Id.*

The defendant in *Harbison* was convicted of three counts of employing a firearm during the commission of a dangerous felony based on three convictions of attempted voluntary manslaughter involving three victims. *Id.* at 170. Our supreme court determined that Code section 39-17-1324 "did not limit the State to charging a single count

of employing a firearm if multiple dangerous felonies were committed against multiple victims in a single criminal episode." *Id.* at 168. The court found it "significant that section 39-17-1324 provides that a violation of subsection (a) or (b) is a specific and separate offense and must be pled in a separate counts of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony." *Id.* at 169 (citing T.C.A. § 39-17-1324(d)). The court stated that "[t]his language reinforces the conclusion that the General Assembly has authorized a separate employing a firearm charge for each dangerous felony committed." *Id.*

Recently, this court, relying on the holding in *Harbison*, held that a defendant's dual convictions of possessing a firearm during the commission of a dangerous felony did not violate the principles of double jeopardy when "the defendant committed two dangerous felonies—possession of cocaine with intent to sell or deliver and possession of marijuana with intent to sell or deliver—while possessing the firearm." *State v. Kentavis Antwon Jones*, No W2022-00046-CCA-R3-CD, 2023 WL 1980871, at *9 (Tenn. Crim. App., Jackson, Feb. 14, 2023), *perm. app. denied* (Tenn. May 15, 2023). Thus, this court held that the trial court erred in merging the two separate firearms convictions. *Id.*

We note that similar to the offense of employing a firearm during the commission of a dangerous felony, Code section 39-17-1324 also does not limit the State to charging a single count of possessing a firearm with the intent to go armed during the commission of a dangerous felony if multiple dangerous felonies were committed. Based on the reasoning set forth in *Harbison*, we conclude that the legislature intended the unit of prosecution for Code section 39-17-1324(a) to be each act of possessing a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony. *Harbison*, 539 S.W.3d at 168-69. In other words, the legislature has authorized a separate charge of possessing a firearm for each dangerous felony committed.

The State asserts that the principles of double jeopardy do not bar the defendant's three firearm convictions because he committed three separate dangerous felonies—possession of cocaine with intent to sell, deliver, or manufacture; possession of heroin with intent to sell, deliver, or manufacture; and possession of fentanyl with intent to sell, deliver, or manufacture—while possessing a firearm. The defendant challenges his stand-alone convictions for possession of heroin with intent to sell, deliver, or manufacture and possession of fentanyl with intent to sell, deliver, or manufacture as violating double jeopardy principles because both controlled substances were contained in the same mixture. The defendant admittedly failed to raise a double jeopardy challenge to his stand-alone heroin and fentanyl convictions in his motion for new trial. *See* Tenn. R. App. P. 3(e); *Harbison*, 539 S.W.3d at 164 ("To preserve the double jeopardy issue, [the defendant] had to raise it in his motion for new trial and appellate brief."). Generally, our review would be limited to plain error. *See* Tenn. R. App. P. 36(b); *State v. Martin*, 505 S.W.3d

- 16 -

492, 504 (Tenn. 2016); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). However, to resolve the issue of whether the defendant's three separate firearm convictions violate double jeopardy principles, an issue that the defendant properly preserved on appeal, we must determine whether the defendant committed three separate dangerous felonies, which necessarily requires an examination of whether separate convictions for the predicate dangerous felonies, i.e., the controlled substance convictions, may be sustained.

Pursuant to Tennessee Code Annotated section 39-17-417(a)(4), "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." "'Controlled substance' means a drug, substance, or immediate precursor in Schedules I through VII of §§ 39-17-403—39-17-416[.]" T.C.A. § 39-17-402(4). The factors to be considered by the commissioner of mental health and substances abuse services to determine the schedule of a drug, substance, or immediate precursor include "[t]he actual or relative potential for abuse;" any "scientific evidence of its pharmacological effect;" current scientific knowledge regarding the substance; "[t]he history and current pattern of abuse;" "[t]he risk to the public health;" the substance's potential to "produce psychic and physiological dependence liability;" and "[w]hether the substance is an immediate precursor of a substance already controlled under this section." *Id.* § 39-17-403(a)(1)-(8). Heroin is a Schedule I controlled substance, *id.* § 39-17-406(c)(11), and fentanyl is a Schedule II controlled substance, *id.* § 39-17-408(c)(9). As applicable to the instant case, possession with intent to manufacture, deliver, or sell a Schedule I controlled substance is a Class B felony, *id.* § 39-17-417(b), and possession with intent to manufacture, deliver, or sell a Schedule II controlled substance is a Class C felony, *id.* § 39-17-417(c)(2)(A) (Supp. 2019).

In *State v. Campbell*, our supreme court analyzed the former Tennessee Drug Control Act, which included language similar to the current provisions, and concluded that the defendant's separate convictions for the sale of a Schedule II controlled substance and the sale of a Schedule IV controlled substance that arose out of the same transaction did not violate the principles of double jeopardy. *State v. Campbell*, 549 S.W.2d 952, 955 (Tenn. 1977). The court noted that "two different schedule substances were sold, each of which had been, by statute, separately classified and penalized by separate subsections of the general prohibitory statute." *Id.* (citations omitted). The court held that "[c]onsidering the statutory scheme and legislative history of the Tennessee Drug Control Act, we are convinced that our legislature intended that a sale of two or more controlled substances, classified separately in the schedules of the Act, should constitute separate and distinct offenses." *Id.* at 956.

In *State v. Collier*, our supreme court applied the reasoning set forth in *Campbell* and held that "the possession with intent to sell . . . two or more controlled substances classified within the same schedule of the Act constitutes separate and distinct

offenses." *State v. Collier*, 567 S.W.2d 165, 166 (Tenn. 1978). Like current Code section 39-17-417(a)(4), the statute in effect at the time provided that "it is unlawful for any person to . . . possess with intent to . . . sell, a controlled substance." *Collier*, 567 S.W.2d at 166 (quoting T.C.A. § 52-1432 (repealed)). The court also cited to the statutory definition of "controlled substance," which is the same definition provided in current Code section 39-17-402(4). *Collier*, 567 S.W.2d at 166-67 (quoting T.C.A. § 52-1409 (repealed)). The court held that "the foregoing definitions, considered in the light of the overall purpose and scheme of the Act to stamp out the traffic in dangerous drugs, indicates the legislative intent to create a separate offense for the possession of each of the controlled substances set out in Schedules I through VI of the Act." *Id.* at 167. The court explained that

> the Drug Control Act established a classification of controlled substances into different "schedules" based upon the relative potential of each substance for abuse, the degree of physical or psychological dependence its use might engender and its acceptability for medical use in treatment. Drugs within a single schedule are considered to be approximately equal in dangerousness but, as a group, they are considered to be more dangerous than the drugs listed in some of the other schedules and less dangerous than the drugs listed in still different schedules. Thus, penalties reflecting these distinctive degrees of danger vary from schedule to schedule within the Act. Nevertheless, each drug within a given schedule was placed there because it, individually, is dangerous and warranted control. . . . In order to be placed within a schedule, the Act requires that each individual drug or substance be considered in light of at least eight criteria. In our opinion, each drug in a given schedule, in effect, comprises a separate subsection in the statutory scheme[.]

*Id*. (internal citations omitted).

We conclude that the analysis set forth by our supreme court in *Campbell* and *Collier* based upon statutory language similar to the current statutory scheme is also applicable to the current case. Furthermore, we note that by prohibiting possession of "*a* controlled substance" rather than possession of "controlled substances" or "one or more controlled substances," the legislature indicated its intent to permit a defendant to be charged with each controlled substance he or she possessed. *See e.g., Edwards v. State*, 268 So.3d 849, 851-53 (Fla. DCA 2019) (holding that the defendant's separate convictions for the sale of heroin and the sale of fentanyl where the controlled substances were included in the same mixture did not violate double jeopardy principles under the "allowable unit of prosecution" standard when the applicable statute prohibiting the sale of "*a* controlled substance" indicated the legislature's intent to punish the defendant for the sale of each

controlled substance) (emphasis added); *Howard v. Commonwealth*, No. 0780-17-1, 2018 WL 2604993, at \*3 (Va. Ct. App. 2018) (holding that by prohibiting the possession of "a" controlled substance and classifying a violation with respect to "any" Schedule I or Schedule II controlled substance as a Class 5 felony, "the legislature selected a term that would permit a defendant to be charged for *each* controlled substance he possesses" even if multiple controlled substances were packaged in a single container or a single capsule) (emphasis in original).  Had the legislature intended that a single conviction encompass multiple controlled substances within a single mixture, the legislature would have utilized different language specifically prohibiting the possession of a mixture, compound, or substance containing "one or more" controlled substances.  *See Howard*, 2018 WL 2064993, at \*3.

We conclude that based on the plain language of Code sections 39-17-417(a)(4) and 39-17-402(4), as well as our supreme court's analysis in *Campbell* and *Collier* regarding the legislative intent of similar statutory provisions, the unit of prosecution of Code section 39-17-417(a)(4) is each act of possessing a controlled substance with the intent to sell, deliver, or manufacture.  Stated differently, we conclude that the legislature has authorized a separate charge for each controlled substance possessed even if those controlled substances are included within the same mixture, compound, or substance.

Therefore, the defendant possessed three different controlled substances, cocaine, heroin, and fentanyl, with the intent to sell, deliver, or manufacture.  The defendant does not challenge his conviction for possession of cocaine with the intent to sell, deliver, or manufacture as violating the principles of double jeopardy, and we conclude that his separate convictions for possession of heroin with intent to sell, deliver, or manufacture and possession of fentanyl with intent to sell, deliver, or manufacture do not violate double jeopardy principles.  Furthermore, the defendant committed three dangerous felonies—possession of cocaine with intent to sell, deliver, or manufacture; possession of heroin with intent to sell, deliver, or manufacture; and possession of fentanyl with intent to sell, deliver, or manufacture—while possessing a firearm after having been previously convicted of a dangerous felony.  The defendant's three convictions of possessing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony in Counts 11 through 13 likewise do not violate the principles of double jeopardy.

We note that the jury found that the defendant possessed more than 15 grams of heroin.  Because heroin is a Schedule I controlled substance, T.C.A. § 39-17-406(c)(11), possession of heroin with intent to sell, deliver, or manufacture is a Class B felony, and the possible punishment includes a maximum fine of $100,000, *id.* § 39-17-417(b).  If the offense involves "[f]ifteen (15) grams or more of any substance containing heroin," the offense is still a Class B felony, but the maximum fine is increased to $200,000.  *Id.* § 39-

17-417(i)(1). Because the TBI agent who tested the substances testified only to the total weight of the mixture that included both heroin and fentanyl, the weight of the substance found by the jury ostensibly contained both heroin and fentanyl. However, by agreement of the parties, the trial court imposed a $2,000 fine, and, therefore, the defendant's punishment was not increased as a result of the jury's finding of the weight of the "substance containing heroin." Accordingly, we need not determine whether double jeopardy principles prohibit additional punishment for controlled substance offenses where the controlled substance for one offense is included in the calculation of the weight of the substance for the other offense. Rather, based on the specific circumstances of the specific case, we conclude that the trial court properly declined to merge the firearm convictions into a single conviction and to merge the heroin and fentanyl convictions.

We note that the appellate record does not include the judgments for Counts 8, 10, 14, and 16 through 21, showing that the charges for those counts were dismissed by the State. Accordingly, we remand to the trial court for entry of judgments on these counts reflecting dismissal of the charges. We otherwise affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

- 20 -